# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| KATRINA WALKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 12-cv-8571 |
| | ) | |
| Chicago Police Officer CARL | ) | |
| WEATHERSPOON, STAR # 4630, | ) | |
| SGT. SEAN MARTIN, #1662, OFFICER | ) | |
| JERRY CRISP, #12580, OFFICER | ) | |
| CHRIS CHMELAR, # 18896, OFFICER | ) | |
| JAMES DAVIS, # 13462, OFFICER | ) | |
| EDWARD JOHNSON, # 9539, OFFICER | ) | |
| PATRICK MCDONOUGH, # 14416, | ) | |
| OFFICER GERALD O'MALLEY, # 17187 | ) | |
| and the City of Chicago, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Timothy P. Scahill (6287296)
Graham P. Miller (6290240)
Andrew K. Scott (6306956)
BORKAN & SCAHILL, LTD.
Two First National Plaza
20 South Clark Street
Suite 1700
Chicago, Illinois 60603
(312) 580-1030

## TABLE OF CONTENTS

INTRODUCTION..................................................................................................................1

FACTUAL BACKGROUND.................................................................................................1

ARGUMENT........................................................................................................................7

    I.      DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON
           PLAINTIFF'S SEARCH AND SEIZURE CLAIMS ...................................................7

         A.      Defendants' Search Of 4718 S. Shields Did Not Violate The
               Fourth Amendment ..........................................................................................8

               1.      The officers were executing a valid search warrant .........................9

               2.      The officers executed the warrant in a fully constitutional
                     fashion..............................................................................................10

         B.      Defendants Are Entitled To Qualified Immunity ...........................................14

    II.      PLAINTIFF'S EXCESSIVE FORCE CLAIM FAILS AS A MATTER
           OF LAW.................................................................................................................18

    III.     PLAINTIFF'S CONSPIRACY CLAIM FAILS BECAUSE THERE IS NO
           UNDERLYING VIOLATION ...............................................................................19

    IV.     PLAINTIFF'S BATTERY, ASSAULT, AND IIED CLAIMS ARE NOT
           SUPPORTED BY THE RECORD AND ARE BARRED BY THE TORT
           IMMUNITY ACT ..................................................................................................20

CONCLUSION....................................................................................................................22

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Creighton,*
    483 U.S. 635, 640 (1987) .................................................................15, 18

*Ashcroft v. al-Kidd,*
    131 S.Ct. 2074, 2085 (2011) ................................................................15

*Barron v. Sullivan,*
    1997 WL 158321, at *5 (N.D. Ill. 1997) .................................................12

*Beauchamp v. City of Noblesville,*
    320 F.3d 733, 742 (7th Cir.2003)..........................................................8

*Billups v. Kinsella,*
    2010 WL 5110121, at *5 (N.D.Ill. 2010)...........................................11, 12

*Blake v. Peterson,*
    1995 WL 360702, at *4 (N.D. Ill. 1995) .................................................15

*Cefalu v. Village of Elk Grove,*
    211 F.3d 416, 423 (7th Cir. 2000) .........................................................20

*Celotex Corp. v. Catrett,*
    477 U.S. 317, 324 (1986) ....................................................................20

*Cooper v. Dailey,*
    2011 WL 4501557 (N.D.Ill. 2011) .....................................................12, 21

*Dalia v. U.S.,*
    441 U.S. 238, 257 (1979)....................................................................9

*Donovan v. City of Milwaukee,*
    17 F.3d 944, 952 (7th Cir.1994) ...........................................................15

*Eversole v. Steele,*
    59 F.3d 710, 717-18 (7th Cir. 1995).......................................................15

*Franks v. Delaware,*
    438 U.S. 154, 171–72 (1978)............................................................8, 10

*Gatzimos v. Garrett*,
  431 Fed.Appx. 497, 500 (7th Cir. 2011)........................................................8, 10

*Graham v. Connor*,
  490 U.S. 386, 399 (1989)........................................................................9

*Harlow v. Fitzgerald*,
  457 U.S. 800, 818 (1982) ........................................................................15

*Hebron v. Touhy*,
  18 F.3d 421, 423 (7th Cir.1994) ................................................................8

*Hill v. California*,
  401 U.S. 797 (1971)................................................................................9

*Hunter v. Bryant*,
  502 U.S. 224, 227 (1991) ........................................................................15

*Jacobs v. City of Chicago*,
  215 F.3d 758, 768-69 (7th Cir. 2000)........................................................9, 12

*Johnson v. Manitowoc County*,
  635 F.3d 331, 334-35 (7th Cir. 2011)........................................................9

*Jones v. Wilhelm*,
  425 F.3d 455 (7th Cir. 2005) ...................................................................12

*Junkert v. Massey*,
  610 F.3d 364, 367 (7th Cir. 2010)............................................................8, 16

*Los Angeles County, California v. Rettele*,
  550 U.S. 609 (2007) ............................................................................13, 18

*Malley v. Briggs*,
  475 U.S. 335, 344-45 (1986) ...................................................................16

*Mannoia v. Farrow*,
  476 F.3d 453, 458 (7th Cir. 2007)............................................................8, 10

*Maryland v. Garrison*,
  480 U.S. 79, 84, 86-87 (1987)...............................................................9, 12, 14

*Messerschmidt v. Millender*,
  132 S.Ct. 1235 (2012) ...........................................................................18

*Michigan v. Summers*,
452 U.S. 692, 705 (2005) ...................................................................19

*Mickiel v. Beluso*,
2011 WL 2295278, at *4 (N.D.Ill. 2011) ...........................................21

*Miller v. Lewis*,
381 F. Supp. 2d 773, 786-87 (N.D. Ill. 2005) ...................................19

*Milner v. City of Chicago*,
2002 WL 1613720, at *3 (N.D.Ill. 2002) ...........................................19

*Molina ex rel. Molina v. Cooper*,
325 F.3d 963, 973 (7th Cir. 2003)........................................................9

*Molina ex rel. Molina v. Cooper*,
2002 WL 426035, at *7 n.2 (N.D. Ill. 2005) ......................................19

*Montalvo v. Adreani*,
2013 WL 1181490, at *6 (N.D. Ill. 2013)...............................9, 10, 17

*Muehler v. Mena*,
544 U.S. 93, 98-100 (2005)..........................................................11, 19

*Nuzzi v. St. George Community Consol. Sch. Dist. No. 258*,
688 F.Supp.2d 815, 840 (C.D. Ill. 2010) ...........................................20

*Pearson v. Callahan*,
555 U.S. 223, 231 (2009) ..............................................................15, 16

*Regaldo v. Hayes*,
2011 WL 5325542, at*1, *6-7 (N.D. Ill. 2011) ................................21

*Scott v. Harris*,
550 U.S. 372, 376 n.2 (2007) .............................................................15

*Simmons v. Boldus*,
221 F.3d 1339 (Table), at *3 (7th Cir. 2000) ....................................11

*Smith v. Augustine*,
2009 WL 481639, *8 (N.D. Ill. 2009) ...............................................21

*Smith v. City of Chicago*,
242 F.3d 737, 744 (7th Cir. 2001) ......................................................20

*Smith v. Gomez,*
  550 F. 3d 613, 617 (7th Cir. 2008) ................................................................20

*Smith v. Village of Norridge,*
  2009 WL 210458, *13 (N.D. Ill. 2009) ..........................................................21

*Spiegel v. Cortese,*
  196 F.3d 717, 723 (7th Cir.1999) ..................................................................15

*U.S. v. Barnes,*
  909 F.2d 1059, 1069 (7th Cir. 1990) ..............................................................14

*U.S. v. Koerth,*
  312 F.3d 862, 866 (7th Cir.2002) .....................................................................9

*U.S. v. Lake,*
  500 F.3d 629, 633 (7th Cir. 2007) ..............................................................10, 17

*U.S. v. Lloyd,*
  71 F.3d 1256, 1263 (7th Cir.1995) .........................................................8, 10, 17

*U.S. v. McGaughy,*
  485 F.3d 965, 969-70 (7th Cir. 2007) ...............................................................8

*U.S. v. Norris,*
  640 F.3d 295, 302-03 (7th Cir. 2011) ...............................................................9

*U.S. v. Pritchard,*
  745 F.2d 1112, 1122, (7th Cir. 1984) ..............................................................11

*U.S. v. Saadeh,*
  61 F.3d 510, 518 (7th Cir. 1995) ...................................................................14

*U.S. v. Sims,*
  551 F.3d 640, 643-44 (7th Cir. 2008) .....................................................8, 10, 17

*U.S. v. Stokes,*
  --- F.3d ---, 2013 WL 3948949, at *9 (7th Cir. 2013) ......................................11

*U.S. v. Stowe,*
  100 F.3d 494, 499 (7th Cir. 1996) ....................................................................9

*Vinning-El v. Evans,*
  2011 WL 4336661, *3 (7th Cir. 2011) .............................................................15

*Wilkins v. May*,
 872 F.2d 190, 194 (7th Cir. 1989) ........................................................................19

*Wilson v. Layne*,
 526 U.S. 603, 614 (1999) ........................................................................15, 16, 18

## INTRODUCTION

Plaintiff Katrina Walker ("plaintiff") filed this action against Chicago Police Officers Carl Weatherspoon, Sean Martin, Jerry Crisp, Chris Chmelar, Edward Davis, Patrick McDonough, and Gerald O'Malley ("defendant officers") seeking to recover damages allegedly sustained when the defendant officers obtained and executed a search warrant on her residence at 4718 S. Shields in Chicago on October 26, 2011. In essence, plaintiff alleges that the search of her residence and her detainment during said search violated her Fourth Amendment rights. For the reasons set forth below, defendants are entitled to summary judgment on all counts of plaintiff's Amended Complaint.

## FACTUAL BACKGROUND

The defendant officers are members of the Chicago Police Department and, at times relevant to this case, were members of the Area Central Anti-Violence Task Force ("Task Force"). SMF at ¶ 1.[1] This team is primarily responsible for executing search warrants. *Id*. Officer Weatherspoon, a member of the Chicago Police Department since 1988, has executed hundreds of warrants with the Task Force in the last three years. *Id*. at ¶ 2.

A few days prior to October 26, 2011, Officer Weatherspoon was contacted by two fellow police officers who advised that they had been in contact with a "J. Doe" informant (hereinafter "J. Doe")[2] who had information about the sale of narcotics. *Id*. at ¶ 3. Using a telephone number provided by these fellow officers, Officer Weatherspoon called J. Doe shortly after receiving the information. *Id*. at ¶ 3, 5 J. Doe told Officer Weatherspoon that she had been buying heroin from a man known as

---

[1] Citations herein are as follows: Defendants' Local Rule 56.1 Statement of Material Facts = "SMF at ¶ ___". Defendants' Addendum of Exhibits in Support of Summary Judgment = "Ex. ___ at ___."

[2] A "J. Doe" informant is an one who reports to the police voluntarily and without promise of compensation. *Id*. at ¶ 4. Such informants are distinguishable from those who the Chicago Police Department classifies as "confidential informants" ("C.I.'s") who sign up to receive payment in exchange for providing information to the police. *Id*. at ¶ 4.

"T" and that she could show Officer Weatherspoon where "T" sold her drugs. *Id*. at ¶ 5. When J. Doe provided this information, she was not under arrest or otherwise in custody, was not in any legal trouble, and had contacted the Chicago Police Department on her own volition. *Id*. at ¶ 6. J. Doe told Officer Weatherspoon that she was trying to do better, trying not to disappoint her parents, and trying to kick her drug habit. *Id*. at ¶ 32.

Thereafter, J. Doe came to the police station, accompanied by her father, and met with Officer Weatherspoon. *Id*. at ¶¶ 7-8. During that initial meeting, J. Doe confirmed the information that Officer Weatherspoon's fellow officers had provided, described how she bought heroin from an individual known as "T," told Officer Weatherspoon how she would set up the meetings to buy heroin, and, most importantly, told Officer Weatherspoon where those narcotics transactions took place. *Id*. at ¶ 9. As to the location where she purchased the drugs, J. Doe provided to Officer Weatherspoon a precise description of and directions to the location of the house where the drugs were routinely purchased by J. Doe, including that she would exit 47th Street, go west from the Dan Ryan a couple of blocks, make a left, and go to a house next to a vacant lot. *Id*. at 10.

In order to ensure that there was no mistake as to the precise residence at issue, Officer Weatherspoon took J. Doe to the house where J. Doe said she bought heroin. *Id*. at ¶ 12. J. Doe gave Officer Weatherspoon specific directions to the location and, upon arrival, specifically identified 4718 S. Shields as the house where she purchased the heroin. *Id*.

Upon arrival at 4718 S. Shields, Officer Weatherspoon again inquired of J. Doe how the drug transactions took place, and J. Doe responded that she would call when she was getting off the expressway at 47th Street to let "T" know she was en route before she met him at the location. *Id*. at ¶ 13. J. Doe told Officer Weatherspoon that, while this individual would occasionally meet her outside 4718 S. Shields, she was also directed inside the actual residence located at 4718 S. Shields on many

2

occasions to purchase drugs. *Id.* at ¶ 14. During the occasions she was directed into 4718 S. Shields to purchase drugs, J. Doe would be directed to remain in a front living room immediately inside the entrance to the residence while "T" would go into a side room and return a short time later with the drugs. *Id.* at ¶ 16. J. Doe told Officer Weatherspoon she had been purchasing drugs from 4718 S. Shields this way for approximately the past six months. *Id.* at ¶ 17. In addition to describing a layout with a front living room with a nearby side room, J. Doe also advised that she had never seen any children in the house and there were no dogs. *Id.* at ¶¶ 18-19.

After the initial visit to 4718 S. Shields with J. Doe, Officer Weatherspoon again returned to 4718 S. Shields and its vicinity to perform surveillance. *Id.* at ¶ 20. The 4700 block of S. Shields is known to be a high narcotics area. *Id.* at ¶ 12. Indeed, while surveilling 4718 S. Shields, Officer Weatherspoon observed two separate narcotics transactions on that block within a period of 20 minutes. *Id.* The next day, Officer Weatherspoon returned to 4718 S. Shields to perform surveillance a second time, and met again with J. Doe regarding her purchase of drugs from 4718 S. Shields. *Id.* at ¶¶ 22-23. In addition, Officer Weatherspoon had several phone conversations with J. Doe relating to her drug purchases at that location prior to obtaining the warrant for 4718 S. Shields. *Id.* at ¶ 24.

On October 24, 2011, J. Doe called Officer Weatherspoon and told him that she had just purchased heroin from "T" at the house at 4718 S. Shields earlier that day. *Id.* at ¶ 28. Based on this, Officer Weatherspoon asked J. Doe whether she would be willing to go before a Judge and attest to the facts surrounding the transaction. *Id.* at ¶ 29. J. Doe agreed. *Id.*

Officer Weatherspoon found J. Doe and the information she provided to be credible and reliable because, among other things, she had not been promised anything in return for giving the information about her drug purchases, was very precise about the location of the house, the directions getting there, and the method by which she would conduct the transactions to purchase drugs at 4718

3

S. Shields, and appeared comfortable and familiar with this high narcotics area where Officer Weatherspoon would otherwise not expect J. Doe to frequent. *Id.* at ¶ 26. Additionally, a background check was performed on J. Doe revealing only one misdemeanor arrest and no convictions. *Id.* at ¶ 11. Officer Weatherspoon also pulled a photo of 4718 S. Shields from the Cook County Assessor's Office. *Id.* at ¶ 25; Ex. 6.

Officer Weatherspoon typed up a Complaint for Search Warrant based on the facts provided by J. Doe and had J. Doe specifically confirm the information contained in the Complaint. SMF at ¶ 30; Ex. 7. Office Weatherspoon obtained approval for the Complaint from Cook County Assistant States Attorney Dustin Smith and presented it to Cook County Judge Harmening with J. Doe on October 25, 2011. SMF at ¶¶ 30-31; Ex. 7.

J. Doe testified under oath before Judge Harmening. SMF at ¶ 33. Judge Harmening questioned J. Doe at length and J. Doe testified to the information contained in the Complaint for Search Warrant, including her past interactions and drug transactions at 4718 S. Shields, as well as J. Doe's general background information and her past use and purchases of narcotics. *Id.* at ¶ 34-35; Ex. 7; Ex. 8.

Judge Harmening also showed J. Doe the photo of 4718 S. Shields from the Cook County Assessor's Office and specifically asked J. Doe to verify that this was the residence where she purchased narcotics. SMF at ¶ 36; Ex. 6. J. Doe specifically confirmed, once again, that 4718 S. Shields was the residence where she had purchased drugs as recently as October 24, 2011. SMF at ¶ 36. After hearing J. Doe testify, Judge Harmening determined there was probable cause to search the residence located at 4718 S. Shields for narcotics and other evidence related to the sale of narcotics and issued the search warrant. *Id.* at ¶ 37; Ex. 8.

The warrant issued commanded the defendant officers to search the premises of the single family brick home at 4718 S. Shields for "Heroin, to wit a controlled substance, any documents

4

proving residency, any paraphernalia used in the cutting or weighing of illegal drugs, any money suspected to be illegal drug sales proceeds, and any records detailing illegal drug transactions" as well as for the individual described as "T." SMF at ¶ 38; Ex. 8.

On October 26, 2011, the day following the issuance of the warrant, the defendant officers arrived at 4718 S. Shields to execute the warrant around 4:15 p.m. SMF at ¶ 39. They reached the steel front security door of 4718 S. Shields and banged loudly, announcing themselves as the police. *Id.* at ¶ 41. When no one answered, the defendant officers breached the door and entered 4718 S. Shields, again announcing they were the police and that they had a search warrant. *Id.* at ¶ 43-44.

Upon entry, the defendant officers found the residence to be extremely unkept and in complete disarray. *Id.* at ¶ 47. Papers, personal effects, household items, clothes, boxes, bags, containers, and garbage were strewn about the floor and furniture. *Id.* at ¶ 48. The photographs comprising Exhibits 4B through 4K truly and accurately reflect the condition of the house as the defendant officers entered it on October 26, 2011. *Id.* at ¶ 45.

Based upon his extensive past experience in executing search warrants on houses for narcotics, Officer Weatherspoon found the unkept and cluttered appearance of the house to be consistent with a house involved in the narcotics trade. *Id.* at ¶ 49. More importantly, however, the layout of the interior of 4718 S. Shields was entirely consistent with the description of the interior given by J. Doe. *Id.* at ¶ 45; Ex. 4B-4C. Specifically, the interior was an undivided single family residence that featured a living room immediately inside its entrance and which featured a nearby side room. *Id.*

Upon entering 4718 S. Shields, the defendant officers split up and, per ordinary and proper procedure, cleared the house for potential threats. *Id.* at 50. Officer Patrick McDonough was the first through the door and proceeded to the room off to the right side of the entry. *Id.* at ¶ 51. Officer McDonough discovered a female inside this room (now known as plaintiff), put his foot in the door

to stop plaintiff from closing it on him, and instructed her to come out. *Id*. at ¶ 52. Shortly thereafter, plaintiff was brought out of her bedroom. *Id*. at ¶ 53.

Officer McDonough carried a rifle as he entered the house and moved toward the room containing plaintiff. *Id*. at ¶¶ 54-55. While Officer McDonough's rifle was near plaintiff for a "brief" moment when plaintiff stood behind the partially closed door, it is undisputed that the rifle was never directly pointed at plaintiff. *Id*. at ¶ 56. Moreover, as plaintiff emerged from her bedroom, none of the defendant officers pointed a gun at plaintiff, and there was no other time that any of the defendant officers pointed a weapon at plaintiff. *Id*. at ¶¶ 57-58. At no time during the execution of the search warrant did a weapon make physical contact with plaintiff. *Id*. at ¶ 59.

Indeed, the remainder of defendants' interaction with plaintiff was minimal and without incident. *Id*. at *Id*. at ¶ 66. Once plaintiff came out of her bedroom, she was immediately led to the front living room while the defendant officers began their search of the house. *Id*. at ¶ 60. Plaintiff remained in the front room for the entirety of the duration of the search and until the defendant officers left the premises. *Id*. at ¶ 65. The only officers other than the female officer who interacted with plaintiff while she was in the front room was an unidentified officer who asked plaintiff about a sled and Sgt. Martin, who gave plaintiff a copy of the warrant. *Id*. at ¶ 66. Other than two instances where plaintiff claims she was screamed at (once by Officer McDonough when he instructed plaintiff to "[p]ut that phone down" and once by Sgt. Sean Martin when he was explaining the basis of the search warrant), all the conversations between plaintiff and the defendant officers during the execution of the warrant were friendly and professional. *Id*. at ¶ 67. Plaintiff admits she was not physically mistreated by the defendant officers at any time. *Id*. at ¶ 68.

After plaintiff was led to the living room, the defendant officers split up and searched the house for narcotics, drug paraphernalia, plastic bags, packaging for narcotics, ledgers, scales, and other items

that may pertain to drug transactions, as commanded in the search warrant. *Id*. at ¶ 61. Not surprisingly, the search for the items listed in the search warrant proved somewhat difficult due to the condition of the house: i.e., the disarray, disorganization and the amount of debris and clutter throughout the house. *Id*. at ¶ 70; Ex. 4B-4K.

A substantial amount of time also had to be devoted to searching the house for evidence relating to the potential existence of other non-present residents/occupants of 4718 S. Shields. *Id*. at ¶ 71. This aspect of the search proved somewhat more difficult than normal due to the existence of mail, papers, and other such documents located in boxes and large containers and strewn throughout house. *Id*.; Ex. 4B-4K.

The search for the items stated in the warrant was also complicated somewhat when defendants learned plaintiff had a firearm in the house, but was unable to tell the officers where it was. SMF at ¶¶ 62-63. The defendant officers eventually found the loaded firearm loosely placed in a cardboard box in plaintiff's bedroom under several magazines and secured said firearm to ensure that the search could be conducted safely. *Id*. at ¶ 64; Ex. 4K.

Notwithstanding all of the above challenges, the defendant officers completed the search quickly and efficiently and left the premises within 1.5 to 2 hours after their arrival. SMF at ¶ 73.

## ARGUMENT

## I.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S SEARCH AND SEIZURE CLAIMS.

Counts I and II allege unreasonable seizure and search, respectively, in violation of the Fourth Amendment. Doc. 26 at Cts. I, II. The undisputed facts, however, reveal nothing other than reasonable, proper, and undisputedly constitutional conduct on the part of the defendant officers in both obtaining and executing the search warrant on 4718 S. Shields. Moreover, to the extent the

7

defendant officers' conduct during the particular circumstances of this case were determined in the calm reflection of judicial chambers to technically run afoul of the Fourth Amendment, the defendant officers would clearly be entitled to qualified immunity.

### A.    Defendants' Search Of 4718 S. Shields Did Not Violate The Fourth Amendment.

A search pursuant to a valid warrant is presumptively constitutional unless the officer seeking the warrant intentionally or recklessly misstated or omitted material facts to obtain the warrant, and there would not have been probable cause had the testimony been accurate. *Franks v. Delaware*, 438 U.S. 154, 171–72 (1978); *Gatzimos v. Garrett*, 431 Fed.Appx. 497, 500 (7th Cir. 2011); *Mannoia v. Farrow*, 476 F.3d 453, 458 (7th Cir. 2007). In determining whether information submitted to a judicial officer in support of a warrant application is sufficient to establish probable cause, the only relevant information is that known at the time of the application, not that learned during a search or at some other later date. *Beauchamp v. City of Noblesville*, 320 F.3d 733, 742 (7th Cir.2003); *Hebron v. Touhy*, 18 F.3d 421, 423 (7th Cir.1994).   Moreover, "great deference" is afforded to the issuing judge's conclusion that probable cause was established. *Junkert v. Massey*, 610 F.3d 364, 367 (7th Cir. 2010); *U.S. v. Sims*, 551 F.3d 640, 643-44 (7th Cir. 2008).

Not surprisingly, when a confidential informant is involved, a crucial consideration is whether the informant personally appeared and presented an affidavit or testified before the magistrate, thus allowing the judge to evaluate the informant's knowledge, demeanor, and sincerity. *Sims*, 551 F.3d at 645; *U.S. v. Lloyd*, 71 F.3d 1256, 1263 (7th Cir.1995). In such instances, a determination of the validity of the warrant and later search is at its apex. *Id.*; *see also U.S. v. McGaughy*, 485 F.3d 965, 969-70 (7th Cir. 2007)("Doe swore out an affidavit and attested to the veracity of those statements before an Illinois circuit judge. The issuing judge was in a position to assess the credibility and veracity of both persons to make his probable cause determination with that additional evidence before

8

him. Under these circumstances, the bald suggestion of bias is insufficient to establish a factual dispute that is material to the probable cause determination");*U.S. v. Koerth*, 312 F.3d 862, 866 (7th Cir.2002).

Armed with a validly ordered search warrant, the manner and method of executing it is generally left to the discretion of the executing officers, subject to the general Fourth Amendment protection against unreasonable searches and seizures. *Dalia v. U.S.*, 441 U.S. 238, 257 (1979); *U.S. v. Norris*, 640 F.3d 295, 302-03 (7th Cir. 2011); *Johnson v. Manitowoc County*, 635 F.3d 331, 334-35 (7th Cir. 2011); *U.S. v. Stowe*, 100 F.3d 494, 499 (7th Cir. 1996). The issue, then, for Fourth Amendment claims based on the execution of a search warrant is whether the defendant officers' conduct was objectively reasonable under the circumstances. *Molina ex rel. Molina v. Cooper*, 325 F.3d 963, 973 (7th Cir. 2003) ("When assessing whether a constitutional violation has occurred, the Fourth Amendment inquiry is one of objective reasonableness under the circumstances," quoting *Graham v. Connor*, 490 U.S. 386, 399 (1989)); *Jacobs v. City of Chicago*, 215 F.3d 758, 768-69 (7th Cir. 2000). In that regard, "sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment." *Maryland v. Garrison*, 480 U.S. 79, 87 (1987) (quoting *Hill v. California*, 401 U.S. 797 (1971)); *see also Montalvo v. Adreani*, 2013 WL 1181490, at *6 (N.D. Ill. 2013)("Probable cause is not evaluated with the benefit of "hindsight, based on what a search does or does not turn up. Rather, the validity of the warrant is 'judged on the basis of the information available at the time the warrant was issued'" (internal citation, quotation omitted)).

### 1. The officers were executing a valid search warrant.

First, there can be no question the warrant in this case was valid. J. Doe was an informant who came to the police on her own volition. SMF at ¶ 6. She was detailed and consistent with her description of how, where, and from whom she purchased narcotics, and provided other indicia of credibility and reliability to Officer Weatherspoon, who had 23 years on the job and had executed

9

hundreds of search warrants. *Id*. at ¶¶ 2, 9-10, 12, 13-16, 26.

More importantly, J. Doe appeared before a judge and answered his questions under oath and under penalty of perjury regarding the basis for the search warrant. *Id*. at ¶¶ 33-35. Specifically, J. Doe testified to the information contained in the Complaint for Warrant, including the specifics with respect to her purchase of heroin at 4718 S. Shields the day before. *Id*. at 35. Judge Harmening showed J. Doe the photo of 4718 S. Shields from the Cook County Assessor and J. Doe verified the house. *Id*. at ¶ 36. Judge Harmening found J. Doe to be credible and found there to be probable cause to search 4718 S. Shields for narcotics and anything related to the sale of narcotics. *Id*. at ¶ 37. Search warrants are universally held valid under such circumstances. *See, e.g., Sims*, 551 F.3d at 645; *U.S. v. Lake*, 500 F.3d 629, 633 (7th Cir. 2007); *Lloyd*, 71 F.3d at 1263; *Montalvo*, 2013 WL 1181490, at *5. Accordingly, defendants' search of 4718 S. Shields was presumptively constitutional. *Franks*, 438 U.S. at 171–72; *Gatzimos*, 431 Fed.Appx. at 500; *Mannoia*, 476 F.3d at 458.

## 2. The officers executed the search warrant in a fully constitutional fashion.

Second, the record also establishes that the execution of the warrant was performed professionally, efficiently, and in accordance with the mandates of the Fourth Amendment. The defendant officers gained entry to the house with minimal damage or interaction with plaintiff. SMF at ¶¶ 41-44, 50-60. The use of force – limited only to drawn weapons for a "brief" time period during the breach – was negligible. *Id*. at ¶¶ 52-60. Plaintiff was not physically mistreated, was not even handcuffed and, in fact, had minimal contact with any of the defendant officers as she was in her living room with a uniformed female officer for the duration of the search. *Id*. at ¶¶ 65-66, 68. Other than the two instances where she claims to have been screamed at, plaintiff admits all conversation between herself and the defendant officers was friendly and professional. *Id* at ¶ 67.

Further, under the circumstances presented, the actual search of plaintiff's home was performed

efficiently and entirely within the scope of the warrant. The warrant authorized the defendant officers to search the entire house for narcotics, and narcotics-related evidence, in addition to proof of residency documents. *Id*. at ¶ 38; Ex. 8. Obviously such items (ranging from cash to baggies to pieces of paper) could have been be found anywhere in the house. As can be gleaned from the photos of the residence, 4718 S. Shields was in utter disarray at the time the defendant officers entered the house. *Id*. at ¶¶ 45, 47-49; Ex. 4B-4K. Papers, personal effects, household items, clothes, boxes, bags, containers, and garbage appeared all over the floor and furniture, filling the rooms throughout the house with no apparent organization. *Id*. at 48.

The search for narcotics and related evidence, as well as proof of residency was substantially, and understandably, complicated due to the unkempt condition of the house. *Id*. at ¶¶ 70-71. It also took defendant officers some time to locate and secure plaintiff's firearm (the location of which plaintiff could not provide) in a cardboard box under a stack of old magazines. *Id*. at ¶ 62-64; Ex. 4K. Although generally satisfied with the sufficiency of their search, defendants search was, in fact, cut short because of the condition of the house. *Id*. at ¶ 69.

Under these circumstances, defendant officers' search pursuant to the warrant, lasting between 1.5 to 2 hours, was eminently reasonable. *See, e.g., U.S. v. Pritchard*, 745 F.2d 1112, 1122, (7th Cir. 1984) (3 hour search of residence reasonable); *Simmons v. Boldus*, 221 F.3d 1339 (Table), at *3 (7th Cir. 2000) (2-3 hour duration of search of house reasonable); *see also U.S. v. Stokes*, --- F.3d ---, 2013 WL 3948949, at *9 (7th Cir. 2013) (two hour search of home reasonable even under general Fourth Amendment reasonableness standard for warrantless searches); *Muehler v. Mena*, 544 U.S. 93, 98-100 (2005) (detention of homeowner during two to three hour search of house reasonable); *Billups v. Kinsella*, 2010 WL 5110121, at *5 (N.D.Ill. 2010) (same); *Barron v. Sullivan*, 1997 WL 158321, at *5 (N.D. Ill. 1997) (same).

11

To the extent plaintiff's Fourth Amendment claims are based upon the theory that defendants should have withdrawn because they were put on notice that they were in a location erroneously included within the terms of the warrant (*see e.g. Jones v. Wilhelm*, 425 F.3d 455 (7th Cir. 2005); *Jacobs*, 215 F.3d 758, *Cooper v. Dailey*, 2011 WL 4501557 (N.D.Ill. 2011)), any such argument fails on its face. Unlike the cases referenced above, this case certainly does not involve a mistake in the search warrant as to the residence that was to be searched or the search of a multi-unit dwelling when a search warrant describes only a single family dwelling. *See Jacobs*, 215 F.3d at 769 (officers should have ceased search when they realized warrant for entire building was fatally defective in that building actually contained three units); *Jones* 425 F.3d at 462-63 (search unreasonable where officer knew prior to execution that description in search warrant would lead to the wrong apartment and was therefore invalid); *Cooper*, 2011 WL 4501557, at *2-3 (question of fact remained as to whether officers should have known warrant described the wrong location after they discovered basement apartment was not a habitated apartment at all and second floor apartment was occupied by a family rather than the "party house" described in the warrant). To the contrary, the house at 4718 S. Shields was the actual premises described in the search warrant, identified precisely and repeatedly by J. Doe to Officer Weatherspoon, and confirmed under oath and penalty of perjury before Judge Harmening the day before. SMF at ¶¶ 9-10, 12, 36; Ex. 8.

In any event, the defendant officers encountered nothing that would have suggested to a reasonable officer that the information contained in the warrant and complaint for warrant was erroneous. *See Garrison*, 480 U.S. at 86-87 (officer would have been obligated to stop their search only knew of should have known the warrant contained error). To the extent plaintiff could be heard to suggest that the officers were required to immediately withdraw when they did not immediately discover the personal presence of "T" upon execution of the warrant, this contention has been

specifically rejected by the United States Supreme Court as "unsound" reasoning.  *See Los Angeles County, California v. Rettele*, 550 U.S. 609 (2007)(affirming execution of search warrant which named 3 African American subjects when residence initially found to contain Caucasian subjects and noting that "The presence of some Caucasians in the residence did not eliminate the possibility that the suspects lived there as well.").

4718 S. Shields was a single family residence, as described in the warrant.  SMF at ¶ 38; Ex. 8.  The layout of the house was consistent with what was described by J. Doe, in that one enters into the front living room and there is a front room off to the side.  *Id*. at ¶¶ 19, 46; Ex. 4C. The house appeared, in the experience of Officer Weatherspoon, to be entirely consistent with a house involved in narcotics activity and in a neighborhood known for narcotics activity. *Id*. at ¶¶ 21, 49.  The only information provided by J. Doe as to occupants in the house was that there were no children or dogs, which proved accurate.  *Id*. at 18. Moreover, J. Doe had been restricted to the front area of the residence of 4718 S. Shields and, thus, the presence of other occupants therein was certainly not necessarily inconsistent. *Id*. at ¶ 16.

Additionally, as stated above, it was somewhat difficult for the officers to rule out that someone fitting the description of "T" resided at 4718 S. Shields due to the condition of the house. In particular, the residence contained mountains of paper and clutter throughout the premises including what appeared to be an entire basket of United States Mail in a United States Postal Service box in plaintiff's bedroom. SMF at ¶ 71; Ex. 4B-4K. In sum, it cannot be seriously argued that the fortuitous absence of the named subject of a search warrant and the presence of another person immediately renders invalid an otherwise valid warrant.  Such a rule would imprudently undermine law enforcement interests and would have the effect of invalidating essentially every search where other occupants of a residence happen to be present when the warrant is executed.

13

In any event, the presence or absence of the individual identified as "T" at the time of execution is ultimately irrelevant to the reasonableness of the search. The warrant at issue was not simply an arrest warrant and was not limited to locating "T." Rather, the warrant was a search warrant for a residence that permitted a search of the entire premises of 4718 S. Shields for narcotics and narcotics-related items based upon probable cause that such items would be found in such location. It is black-letter law that police officers armed with such authority are permitted to search anywhere and everywhere that such items could be found. *See Garrison*, 480 U.S. at 84 ("[T]he scope of a lawful search is "defined by the object of the search and the places in which there is probable cause to believe that it may be found. "); *U.S. v. Saadeh*, 61 F.3d 510, 518 (7th Cir. 1995)("A lawful search of fixed premises generally extends to the entire areas in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search."). In the case of narcotics search warrants, police officers are permitted to search in any areas that narcotics could be found within an identified residence. *See e.g. U.S. v. Barnes*, 909 F.2d 1059, 1069 (7th Cir. 1990)("Although the search warrant is limited to cocaine, it is beyond dispute that cocaine is commonly distributed as a powder in small vials and envelopes and, thus, is easily concealable in confined areas, such as notebooks, hollowed-out books and human body cavities. In their search for cocaine, the agents were authorized to search any and all areas and items where the narcotic might readily be concealed."). Thus, regardless of the presence or absence of "T" at the time of execution, the officers were nonetheless permitted to complete their search for the other items authorized by the warrant.

For the above reasons, defendants are entitled to summary judgment on Counts I and II.

**B.      Defendants Are Entitled To Qualified Immunity.**

Even were the constitutional question a close call, the defendant officers would be entitled to

qualified immunity on Counts I and II. Government officials performing discretionary functions are protected by qualified immunity and are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne*, 526 U.S. 603, 614 (1999); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In essence, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2085 (2011); *Eversole v. Steele*, 59 F.3d 710, 717-18 (7th Cir. 1995)("The qualified immunity standard 'gives ample room for mistaken judgments'..."). The protection of qualified immunity applies regardless of whether officer's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Indeed, qualified immunity "protects public employees who make reasonable errors in applying even clearly established law." *Vinning-El v. Evans*, 2011 WL 4336661, *3 (7th Cir. 2011). Qualified immunity is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Scott v. Harris*, 550 U.S. 372, 376 n.2 (2007). Accordingly, the Supreme Court has "repeatedly...stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Id.*; *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

The burden of defeating an assertion of qualified immunity rests with the plaintiff. *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir.1999). This is "a rather heavy burden, and appropriately so because qualified immunity is designed to shield from civil immunity all but the plainly incompetent or those who knowingly violate the law." *Donovan v. City of Milwaukee*, 17 F.3d 944, 952 (7th Cir.1994); *Blake v. Peterson*, 1995 WL 360702, at *4 (N.D. Ill. 1995). Thus, in addition to proving that her constitutional rights were violated, plaintiff must also prove that such rights were clearly established at the time of the alleged violation. *Pearson*, 555 U.S. at 232; *Wilson*, 526 U.S. at 614

15

(1999). "[C]learly established" for purposes of qualified immunity means that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Wilson*, 526 U.S. at 614-15; *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Wilson* 526 U.S. at 615; *Anderson*, 483 U.S. at 640.

First, the defendant officers are entitled to qualified immunity regarding claims that they violated the Fourth Amendment in obtaining the search warrant on 4718 S. Shields. The Seventh Circuit has laid out the following with respect to the application of qualified immunity under such claims:

> Assuming that the search warrant lacked probable cause, it does not necessarily follow that Massey may be personally liable in Junkert's § 1983 action. Massey is entitled to qualified immunity for his conduct in applying for a search warrant. In this context, the test for qualified immunity comes from *Malley v. Briggs*, 475 U.S. 335, 344-45, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), in which the Supreme Court held that an officer who relies on a subsequently invalidated warrant may be liable for § 1983 damages only if the warrant application was "so lacking in indicia of probable cause as to render official belief in its existence unreasonable." In *Malley*, the Court adopted this qualified immunity standard from the standard established in United *States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), for the good-faith exception to the exclusionary rule. So the evaluation of qualified immunity in obtaining a search warrant is similar to that used in applying the good-faith standard (in fact, there may be no difference at all in the analysis). An officer may be personally liable only if "(1) courts have clearly held that a materially similar affidavit previously failed to establish probable cause under facts that were indistinguishable from those presented in the case at hand; or (2) the affidavit is so plainly deficient that any reasonably well-trained officer 'would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant.'"

*Junkert*, 610 F.3d at 369 (internal citation omitted).

Here, a cursory review of the search warrant affidavit reveals its constitutional validity. It describes in particularity the place to be searched ("4718 S. Shields, Chicago, Cook County, Illinois,

single family brick home") and with specificity the basis for such search (information by an informant who bought heroin from the residence on day prior). Ex. 7. Moreover, the magistrate in this case heard testimony directly from the informant and was able to evaluate her knowledge, demeanor, and sincerity. *Sims*, 551 F.3d at 645; *Lake*, 500 F.3d at 633; *Lloyd*, 71 F.3d at 1263; *Montalvo*, 2013 WL 1181490, at *5.

Second, the defendant officers are also entitled to qualified immunity with regard to any claim with regard to the execution of the warrant. Again, as set forth above, nothing encountered by the defendant officers immediately suggested the information provided by J. Doe was erroneous. These officers were acting on a warrant issued by a magistrate after hearing testimony from a J. Doe informant who had provided detailed and credible verification of narcotics activity at 4718 S. Shields. Upon execution, the officers were presented with a residence that had a layout that appeared to have been accurately described by such informant and appeared to be consistent with the appearance of a house involved in the narcotics trade. Moreover, the information provided by J. Doe as to occupants in the house was that there were no children or dogs (which proved accurate). J. Doe had also been restricted to the front area of the residence of 4718 S. Shields and, thus, the presence of other occupants therein was certainly not necessarily inconsistent with the information provided by J. Doe. The officers were also presented with a house kept in a state of severe disorder that made ascertaining the actual legal residents and occupants thereof exceptionally difficult to verify. Nonetheless, despite this challenges, the officers completed execution of the search warrant in a time frame that has consistently been approved as constitutionally reasonable under far less difficult circumstances. *See supra* Part I.A.2 (citing cases).

Putting aside whether or not the absence of the target individual requires police to immediately discontinue a search for other items described in a valid warrant, there is no indication such was clearly

17

established on October 26, 2011. To the contrary, in February 2012, the United States Supreme Court itself *reversed* a District Court and a reviewing Court of Appeal under similar circumstances. *See Messerschmidt v. Millender*, 132 S.Ct. 1235 (2012). In *Messerschmidt*, the police executed warrants naming a person called Jerry Bowen and authorizing the police to search a specified premises for, among other things, firearms. *Id.* at 1241-42. Upon execution of the warrant, the police discovered that Bowen was not present but, rather only his elderly mother, her daughter, and her grandson. *Id.* The police nonetheless searched the premises and seized the elderly's mother's shotgun. *Id.* Both the district court and the Ninth Circuit Court of Appeals denied qualified immunity to the officers. *Id.* The United States Supreme Court reversed both and ordered that, at minimum, the officers were entitled to qualified immunity. *Id.* at 1249-50. *Messerschmidt* is not an anomaly and the United States Supreme Court has gone even further on prior instances under such circumstances. *See Rettele*, 550 U.S. 609 (reversing denial of qualified immunity and finding no constitutional violation based upon execution of search warrant on residence that named three African American subjects when search revealed only Caucasian individuals in residence). Accordingly, defendants are at minimum entitled to qualified immunity on Counts I and II. *Wilson* 526 U.S. at 615; *Anderson*, 483 U.S. at 640.

## II. PLAINTIFF'S EXCESSIVE FORCE CLAIM FAILS AS A MATTER OF LAW.

Count III alleges the defendant officers used excessive force in violation of the Fourth Amendment when they held plaintiff at gunpoint while they searched her home. Doc. 26 at ¶ 10, Ct. III ¶¶ 22-25. The undisputed facts are that, upon entry into the house, Officer McDonough had his rifle out as he made his initial entry and sweep of the premises, but never pointed it directly at plaintiff even as she was partially behind her bedroom door. SMF at ¶¶ 50-52; 54-56. Although the rifle was near plaintiff as she stood behind the door, it was only for the "brief" period of time before plaintiff was able to get her clothes on and come out from behind the door. *Id.* at ¶¶ 53, 56. When plaintiff

18

emerged from her bedroom, none of the defendant officers pointed a gun at plaintiff. *Id*. at ¶ 57. At no other time did any defendant officer point a weapon at plaintiff. *Id*. at ¶ 58.

This conduct does not amount to a Fourth Amendment violation as a matter of law. "Police officers executing a search warrant for contraband have the authority to detain the occupants of the premises while a proper search is conducted." *Muehler*, 544 U.S. at 98; *Michigan v. Summers*, 452 U.S. 692, 705 (2005). To this end, the Supreme Court recognizes that "unquestioned command" of an area while a search is being conducted is a desirable manner to protect both the safety of the officers and the occupants of the area. *Muehler*, 544 U.S. at 98-99; *Summers*, 452 US. at 703. Thus, while executing a search warrant, police officers may take reasonable action to secure the premises and to ensure their own safety and efficacy of the search, including entering a residence with guns drawn and requiring individuals inside to remain still while performing a protective sweep. *Retelle*, 550 U.S. at 614. The brief pointing of a gun in effecting a search or seizure does not constitute excessive force. *See e.g., Wilkins v. May*, 872 F.2d 190, 194 (7ᵗʰ Cir. 1989)(officer pointing a gun provides "no basis" for an excessive force claim); *Molina ex rel. Molina v. Cooper*, 2002 WL 426035, at *7 n.2 (N.D. Ill. 2005) (brief pointing of a gun at the occupant of a residence "is simply not enough to rise to the level of a Fourth Amendment violation); *Miller v. Lewis*, 381 F. Supp. 2d 773, 786-87 (N.D. Ill. 2005); *Milner v. City of Chicago*, 2002 WL 1613720, at *3 (N.D.Ill. 2002).

## III.   PLAINTIFF'S CONSPIRACY CLAIM FAILS BECAUSE THERE IS NO UNDERLYING VIOLATION.

As set forth above, defendants did not violate plaintiff's constitutional rights. Accordingly, defendants cannot be held liable for conspiring to violate such rights and are entitled to summary judgment on Count IV. *Smith v. Gomez*, 550 F. 3d 613, 617 (7th Cir. 2008); *Cefalu v. Village of Elk Grove*, 211 F.3d 416, 423 (7th Cir. 2000).

19

IV.   **PLAINTIFF'S BATTERY, ASSAULT AND IIED CLAIMS ARE NOT SUPPORTED BY THE RECORD AND ARE BARRED BY THE TORT IMMUNITY ACT.**

Count V alleges a state law claim of battery against the defendant officers based on the allegation that "without the consent of Ms. Walker, Defendants intentionally made contact of an offense of provoking nature by placing a gun against her head." Doc. 26 at Ct. V ¶ 33. Count VI alleges a state law claim of assault, similarly, based on the allegation that "Defendants created a reasonable apprehension of immediate physical harm to Plaintiff by placing and holding a gun to her head. *Id.* at Ct. VI ¶¶ 38. Count VII alleges that the defendant officers' in executing the search warrant intentionally caused plaintiff to suffer from extreme emotional distress. *Id.* at Ct. VII ¶¶ 41-45.

As set forth above, there was no time during the execution of the subject warrant that a weapon was even pointed at plaintiff. *Id.* at ¶¶ 56-58. More importantly, the record is uncontested – based on plaintiff's own deposition testimony – that at no time did a weapon actually make physical contact with plaintiff. *Id.* at ¶ 60. As such, because these claims were apparently based on allegations that have been directly contradicted by plaintiff's own testimony in the record, summary judgment on these claims is required. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)(nonmoving party may not rely solely on pleadings to defeat summary judgment); *Nuzzi v. St. George Community Consol. Sch. Dist. No. 258*, 688 F.Supp.2d 815, 840 (C.D. Ill. 2010).

Moreover, given the above undisputed facts, it is clear that any claim for assault, battery, or IIED would be barred by the Tort Immunity Act given that the above actions clearly occurred during the execution and enforcement of the law. *See* 745 Ill. Comp. Stat. 10/2–202; *Smith v. City of Chicago*, 242 F.3d 737, 744 (7th Cir. 2001)(affirming summary judgment in favor of arresting officers on state law battery claim where the manner of arrest was reasonable and only evidence of injury was plaintiff's testimony that he experienced wrist pain from handcuffs); *Smith v. Augustine*, 2009 WL

481639, *8 (N.D. Ill. 2009)(granting summary judgment on assault and battery claims under Tort Immunity Act); *Smith v. Village of Norridge*, 2009 WL 210458, *13 (N.D. Ill. 2009)(Tort Immunity Act barred IIED claim).

Indeed, beyond the immunities provided in the Tort Immunity Act, claims for Intentional Infliction of Emotional Distress based upon similar allegations as presented in this case have been routinely rejected as wholly insufficient. *See, e.g., Regaldo v. Hayes*, 2011 WL 5325542, at*1, *6-7 (N.D. Ill. 2011)(police officers' execution of search warrant did not rise to the level of outrageous conduct as a matter of law); *Cooper*, 2011 WL 4501557, at *5 (granting summary judgment on IIED claim based on execution of search warrant, including allegations that confidential informant was fabricated and officers allegedly continued to search the premises with canines after they learned it was the wrong house); *Mickiel v. Beluso*, 2011 WL 2295278, at *4 (N.D.Ill. 2011)(claim that defendant officers held plaintiff at gunpoint during search warrant until scene was secured insufficient to support an IIED claim under Illinois law).

Nor is there any evidence in the record whatsoever suggesting that the defendant officers would have any reason to believe this routine execution of a valid search warrant would be certain or substantially certain to result in plaintiff suffering from extreme emotional distress. *Mickiel*, 2011 WL 2295278, at *4 (granting summary judgment plaintiff produced no evidence establishing that any defendant intended to inflict severe emotional distress or knew it was likely to result); *Cooper*, 2011 WL 4501557, at *5 (same). As such, defendants are entitled to summary judgment on Count VII.

**CONCLUSION**

21

WHEREFORE, for the reasons set forth above, defendants pray this Court enter summary judgment in their favor on all counts of plaintiff's Amended Complaint and for whatever other relief this Court deems fit.

Respectfully submitted,

BORKAN & SCAHILL, LTD.

By:      s/Graham P. Miller
         Graham P. Miller

Timothy P. Scahill (6287296)
Graham P. Miller (6290240)
Andrew K. Scott (6306956)
BORKAN & SCAHILL, LTD.
20 South Clark Street, Suite 1700
Chicago, Illinois 60603
(312) 580-1030