UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KATRINA WALKER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 12-cv-8571 |
| ) | |
| Chicago Police Officer CARL ) | |
| WEATHERSPOON, STAR # 4630, ) | |
| SGT. SEAN MARTIN, #1662, OFFICER ) | |
| JERRY CRISP, #12580, OFFICER ) | |
| CHRIS CHMELAR, # 18896, OFFICER ) | |
| JAMES DAVIS, # 13462, OFFICER ) | |
| EDWARD JOHNSON, # 9539, OFFICER ) | |
| PATRICK MCDONOUGH, # 14416, ) | |
| OFFICER GERALD O'MALLEY, # 17187 ) | |
| and the City of Chicago, ) | |
| ) | |
| Defendants. ) | |

**DEFENDANTS LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS[1]**

NOW COME defendants CARL WEATHERSPOON, SEAN MARTIN, JERRY CRISP, CHRIS CHMELAR, JAMES DAVIS, EDWARD JOHNSON, PATRICK MCDONOUGH, GERALD O'MALLEY (collectively, "defendant officers") and the CITY OF CHICAGO, by and through their attorneys, Timothy P. Scahill, Graham P. Miller, and Andrew K. Scott of BORKAN & SCAHILL, LTD., and for their Local Rule 56.1 Statement in support of their Motion for Summary Judgment, state as follows:

1. The defendant officers are members of the Chicago Police Department and form the Area Central Anti-Violence Task Force, which is primarily responsible for executing

---

[1] The following statements are construed in a light most favorable to plaintiff and do not necessarily represent the facts defendants intend to present at trial.

search warrants. Ex. 2 at 10:6-10:11; 17:12-17:14; 106:4-106:11.[2]

2.  Officer Weatherspoon, a member of the Chicago Police Department since 1988, has executed hundreds of warrants with the Area One Anti-Violence Task Force in the last three years alone, addition to his experience executing warrants while on Tactical and Gang Teams. Ex. 2 at 17:15-18:6; Ex. 5 at ¶ 1.

3.  A few days prior to October 26, 2011, Officer Weatherspoon was contacted by two 2nd District police officers – Officer Kerry Murray and Officer Joe Harris – who advised Officer Weatherspoon that they had been in contact with a "J. Doe" informant (hereinafter "J. Doe") who had information concerning a man named "T" who was selling narcotics; Officers Murray and Harris provided Officer Weatherspoon with J. Doe's phone number and handwritten notes relating to their conversation with J. Doe. Ex. 2 at 32:7-32:16; 33:18-34:5; 34:20-34-24; 35:7-35:8; 59:4-59:15; Ex. 3 at No. 4.

4.  A "J. Doe" informant is an informant who reports to the police voluntarily, as opposed to what the Chicago Police Department classifies as "confidential informants," or "CI's," who sign up to receive payment in exchange for information. Ex. 2 at 107:1-107:21.

5.  Officer Weatherspoon called and spoke to J. Doe by phone; J. Doe told Officer Weatherspoon that she normally buys heroin from a man known as "T" and that she could show Officer Weatherspoon where such drugs were sold. Ex. 2 at 36:7-36:20;

---

[2] Citations herein are as follows; Defendants' Addendum of Exhibits in Support of Summary Judgment = "Ex. ___ at ___."

38:4-38:16.

6. When J. Doe provided the information about "T" to Officers Murray, Harris, and Weatherspoon, she had not been arrested, was not in any legal trouble, and had contacted the Chicago Police Department on her own volition. Ex. 2 at 36:7-37:6; 239:3-239:22; Ex. 5 at ¶ 6.

7. During their initial phone conversation, Officer Weatherspoon asked J. Doe to meet him at the police station. Ex. 2 at 41:11-41:21.

8. A short time later, J. Doe came to the police station with her father and met with Officer Weatherspoon for a couple of hours. Ex. 2 at 41:22-43:1; 43:10-43:15; 53:22-54:1.

9. During their initial meeting at the police station, J. Doe confirmed the information that Officers Harris and Murray had provided, spoke about how she bought drugs from "T," gave a description of "T," and told Officer Weatherspoon how she would set up a meeting to purchase drugs and where her drug transactions took place. Ex. 2 at 46:4-48:9.

10. During this initial conversation with Officer Weatherspoon at the police station, J. Doe was descriptive in where the house she purchased drugs from was located, stating that she exits 47th Street, goes west from the Dan Ryan a couple of blocks, makes a left, and goes to a house next to a vacant lot. Ex. 2 at 47:18-48:9.

11. Officer Weatherspoon or one of his team members performed a background check on J. Doe revealing one prior misdemeanor arrest and no convictions. Ex. 2 at 52:11-53:2; Ex. 5 at ¶ 10.

12. After their meeting at the station, Officer Weatherspoon drove J. Doe and her father by the house where J. Doe stated she bought heroin; J. Doe gave Officer Weatherspoon descriptive directions to the location and, upon arrival, pointed to 4718 S. Shields as the house where she purchased heroin. Ex. 2 at 61:22-62:2; 62:9-62:14; 63:5-64:8.64:20-65:8; 66:8-66:10.

13. When Officer Weatherspoon, J. Doe, and J. Doe's father arrived at 4718 S. Shields, Officer Weatherspoon again inquired how the drug transactions took place, and J. Doe responded that she calls "T" when she is getting off the expressway at 47th Street to let him know she is en route before she meets him. Ex. 2 at 66:13-67:4.

14. J. Doe told Officer Weatherspoon that sometimes "T" would meet her outside the house and other times she would be allowed into the house. Ex. 2 at 66:13-67:4; 69:1-69:3.

15. When "T" would meet J. Doe outside the house, "T" would generally give J. Doe a specified location to meet that was in the vicinity of 4718 S. Shields. Ex. 5 at ¶ 8.

16. J. Doe told Officer Weatherspoon that the times she was allowed into 4718 S. Shields, she would remain in the living room while "T" would go into a side room and return a short time later with the drugs. Ex. 2 at 66:13-67:4; 69:1-69:3; Ex. 5 at ¶ 9.

17. J. Doe told Officer Weatherspoon she had been purchasing drugs this way for approximately six months. Ex. 2 at 67:5-67:11.

18. J. Doe told Officer Weatherpoon that she had never seen any children in the house and there were no dogs. Ex. 2 at 67:22-68:12.

19. J. Doe described the inside of 4718 S. Shields as containing a front living room and a room off to the side where the heroin was obtained from. Ex. 2 at 66:13-67:4; 68:20-69:3.

20. After the initial visit to 4718 S. Shields with J. Doe and J. Doe's father, Officer Weatherspoon returned to 4718 S. Shields and its vicinity to perform surveillance. Ex. 2 at 75:11-75:13; 75:17-75:20; 75:24-76:5; 88:14-89:12.

21. The 4700 block of S. Shields is a high narcotics area; while surveilling plaintiff's residence, Officer Weatherspoon observed two narcotics transactions on plaintiff's block within 20 minutes. Ex. 2 at 73:4-73:7; 89:17-90:16; 92:7-101:6.

22. The next day, Officer Weatherspoon returned to 4718 S. Shields to perform surveillance a second time. Ex. 2 at 104:4-104:13.

23. After the initial visit to 4718 S. Shields with J. Doe and J. Doe's father, Officer Weatherspoon met with J. Doe a second time. Ex. 2 at 76:23-80:5.

24. In total, Officer Weatherspoon met with J. Doe twice in person and had several phone conversations with J. Doe prior to obtaining the search warrant for 4718 S. Shields. Ex. 2 at 31:23-32:6; 77:16-77:19.

25. Prior to appearing before the judge, Officer Weatherspoon pulled a photograph of 4718 S. Shields from the Cook County Assessor's Office. Ex. 2 at 82:23-83:5; 163:18-163-164:12; Ex. 6.

26. After meeting with and speaking to J. Doe on several occasions, Officer Weatherspoon found J. Doe and the information she provided to be credible and reliable because, among other things, she had not been promised anything in return

for giving the information about her drug transactions, she was descriptive the location of the house, the directions getting there, and the method by which she would conduct the transactions, and she appeared comfortable and familiar with this high narcotics area where Officer Weatherspoon would otherwise not expect her to spend time. Ex. 2 at 240:19-244:20; Ex. 5 at ¶ 11.

27. Paragraph Omitted.

28. On October 24, 2011, J. Doe called Officer Weatherspoon and told him that she had just purchased heroin from "T" at the house at 4718 S. Shields on October 24, 2011. Ex. 2 at 103:15-103:19; 108:19-108:24; 109:6-109:21; 114:20-115:3; 115:17-115:23; 240:10-240:18.

29. Officer Weatherspoon asked J. Doe whether she would be willing to go before a Judge and attest to the facts surrounding the transactions at 4718 S. Shields, and J. Doe agreed. Ex. 2 at 110:1-110:8; 244:21-244:24.

30. Officer Weatherspoon typed up a Complaint for Search Warrant based on the facts provided by J. Doe, had J. Doe confirm the information contained therein, and presented it to Judge Harmening with J. Doe on October 25, 2011. Ex. 2 at 111:1-111:23; 112:14-112:20; 118:6-118:23; 245:1-245:6; Ex. 7; Ex. 8.

31. Prior to appearing before the judge, Officer Weatherspoon obtained approval for the Complaint for Search Warrant from Assistant States Attorney Dustin Smith. Ex. 2 at 123:24-124:19; Ex. 7; Ex. 8.

32. On the way to testifying before the judge, J. Doe told Officer Weatherspoon that she was trying to do better, trying not to disappoint her parents, and trying to kick her

habit. Ex. 2 at 112:6-112:11.

33. On October 25, 2011, J. Doe testified under oath before Judge Harmening. Ex. 2 at 112:13-113:4; 119:6-119:18; Ex. 8.

34. Judge Harmening questioned J. Doe regarding her purchase of heroin at 4718 S. Shields. Ex. 2 at 119:12-120:7; 245:7-245:11.

35. During the questioning by Judge Harmening, J. Doe testified to the information contained in the Complaint for Search Warrant, including her past interactions and drug transactions and in particular the circumstances surrounding J. Doe's purchase of narcotics at 4718 S. Shields on October 24, 2011, as well as J. Doe's general background information and her past use and purchases of narcotics. Ex. 2 at 119:22-120:7; 245:7-245:23.

36. Judge Harmening also showed J. Doe the photo of 4718 S. Shields from the Cook County Assessor's Office and asked J. Doe whether that was the house at which she purchased narcotics, to which J. Doe answered in the affirmative. Ex. 2 at 163:18-164:12; 245:24-246:10.

37. After hearing J. Doe testify, Judge Harmening determined there was probable cause to search the house at 4718 S. Shields for narcotics, and evidence related to the sale of narcotics; Judge Harmening signed the search warrant, a true and accurate copy is attached as Exhibit 8. Ex. 2 at 120:14-120:19; 246:11-246:21; Ex. 8

38. The search warrant commanded the defendant officers to search the premises of the single family brick home at 4718 S. Shields" for "Heroin, to wit a controlled substance, any documents proving residency, any paraphernalia used in the cutting

or weighing of illegal drugs, any money suspected to be illegal drug sales proceeds, and any records detailing illegal drug transactions" as well as for the individual described as "'T.' Ex. 2 at 249:3-249:17; Ex. 8.

39. The defendant officers arrived at 4718 S. Shields to execute the warrant around 4:15 p.m. on October 26, 2011. Ex. 2 at 121:7-121:16; Ex. 1 at 22:21-22:24.

40. Officer Chris Chmelar was assigned to breach, Officers James Davis and Edward Johnson were assigned to entry, and Officers Patrick and Gerald O'Malley were assigned to security; however, upon arrival Officers Chmelar and Davis broke off to arrest two individuals on the street near plaintiff's residence while the remainder of the defendant officers entered 4718 S. Shields to execute the warrant. Ex. 2 at 141:4-142:10; 143:6-143:13; 148:9-149:1; 151:14-151:19; 154:10-154:12.

41. When the defendant officers reached plaintiff's steel front security door, they banged on it loudly and announced themselves as the police. Ex. 2 at 157:8-157:23.

42. When in her back bedroom, with the door closed and the TV on, as she was on October 26, 2011, plaintiff cannot hear people knocking on her front door, and in fact could not hear the defendant officers knock until the knocking became very loud. Ex. 1 at 74:2-74:24; 111:3-111:9; 136:2-136:15.

43. When no one answered plaintiff's door, the defendant officers breached the door and entered plaintiff's house. Ex. 2 at 157:24-158:18; Ex. 1 at 131:14-131:16.

44. Upon entry, the defendant officers announced they were Chicago Police and that they had a search warrant. Ex. 1 at 137:3-137:9; 139:1-139:3; Ex. 2 at 157:4-157:6.

45. The photographs comprising Exhibit 4A through 4K truly and accurately reflect 4718

S. Shields as it existed at the time of the execution of the warrant on October 26, 2011; specifically, plaintiff's front living room (what one sees immediately as one walks through the front door) (Ex. 4B), kitchen (4C), front bedroom (4D), bathroom (4E), second bedroom (4F), master bedroom (4G and 4I), and basement (4H). Ex. 1 at 26:10-26:12; 98:9-98:17; 101:21-101:22; 102:9-102:11; 103:19-103:24; 105:2-105:5; 104:1-104:2; 105:18-105:19; 106:4-106:8; 108:6-108:7; 113:13:113:17; 111:15-111:16; Ex. 2 at 167:22-168:9; 172:22-173:15.

46. The house contains a front bedroom off to the side between the front living room and kitchen, the door of which is visible as one looks from the front living room toward the kitchen. Ex. 1 at 103:19-103:24; 104:12-104:21; Ex. 4C; Ex. 5 at ¶¶ 13-14.

47. Upon entry into the house, the defendant officers found the house in disarray with clutter all over the place. Ex. 2 at 160:18-161:1; 161:21-161:23; 162:24-163:5; 167:22-168:9; 193:4-194:15; Ex. 4B-4I.

48. Papers, personal effects, household items, clothes, boxes, bags, containers, and garbage appeared all over the floor and furniture, filling the rooms throughout the house with no apparent organization. Ex. 4B-4I.

49. In Officer Weatherspoon's experience, the appearance of the house was consistent with narcotics activity. Ex. 2 at 219:15-220:1; Ex. 5 at ¶ 15.

50. Upon first entering, the defendant officers split up and cleared the house for potential threats. Ex. 2 at 158:12-161:13; 168:10-169:8.

51. Defendant Officer Patrick McDonough was the first through the door and the first officer to reach plaintiff in her bedroom. Ex. 1 at 139:20-140:11; Ex. 2 at 156:24-

157:3; 158:12-158:18.

52. When Officer McDonough reached plaintiff in her bedroom, he put his foot in plaintiff's bedroom door to stop plaintiff from closing it and instructed her to come out. Ex. 1 at 140:1-140:8; 141:5-141:8; 142:1-142:17; 143:17-144:4.

53. After one of the defendant officers gave plaintiff a jacket to wear, plaintiff came out of her bedroom. Ex. 1 at 140:12-140:16; 141:7-141:14; 142:1-142:17.

54. Officer McDonough was the defendant officer carrying the rifle. Ex. 2 at 147:22-148:4; 181:22-181:23.

55. Officer McDonough had his rifle out as he entered the house and as he moved down the hallway. Ex. 1 at 144:9-145:17.

56. Although, upon reaching plaintiff, the barrel of Officer McDonough's rifle was near plaintiff for the "brief" time plaintiff stood behind the partially closed door to her bedroom, the rifle was never pointed at plaintiff. Ex. 1 at 144:9-145:14; 145:24-146:2.

57. When plaintiff emerged from her bedroom, none of the defendant officers pointed a gun at plaintiff. Ex. 1 at 145:15-145:17; Ex. 2 at 169:11-169:20; Ex. 2 at 172:15-172:18.

58. At no other time did any defendant officer point a weapon at plaintiff. Ex. 1 at 145:18-145:20.

59. At no time did a weapon make physical contact with plaintiff. Ex. 1 at 145:21-145:23.

60. Once plaintiff came out of her bedroom, she was immediately led to the front living

room and the defendant officers began their search of the house pursuant to the search warrant. Ex. 1 at 143:7-143:11; 147:13-147:16; Ex. 2 at 171:16-171:18; 172:15-173:12.

61. The defendant officers split up and searched the house for narcotics, drug paraphernalia, plastic bags, packaging for narcotics, ledgers, scales, and other items that may pertain to drug transactions, as set forth in the search warrant. Ex. 1 at 158:1-158:6; 175:20-176:11; 177:3-177:15; 188:6-189:15; Ex. 5 at 12.

62. At some point during the search of the house, plaintiff told the defendant officers she had a firearm in the house. Ex. 1 at 155:22-156:2.; Ex. 2 at 179:17-179:22.

63. Plaintiff was unable to recall where her firearm was, other than it was in her bedroom. Ex. 1 at 117:2-117:10; 118:2-118:6; Ex. 2 at 187:7-187:13.

64. During the course of the search and execution of the warrant, defendant officers searched for plaintiff's firearm, ultimately finding it in a cardboard box under several magazines as depicted in photographs comprising Exhibits 4J and 4K. Ex. 2 at 179:21-179:23; 180:10-180:14; 182:3-182:9; 182:23-183:3; Ex. 4J; Ex. 4K.

65. Plaintiff remained in the front room, with a uniformed female officer who had been called in, for the entirety of the duration of the search and until the defendant officers left the premises. Ex. 1 at 146:3-146:6; 147:3-147:24.

66. The only officers other than the female officer who interacted with plaintiff while she was in the front room was an unidentified officer who asked plaintiff about a sled and Sgt. Martin, who gave plaintiff the warrant. Ex. 1 at 147:23-148:17; 155:2-155:10.

67. Other than two instances where plaintiff claims she was screamed at, once by Officer

McDonough where, upon entering the house, Officer McDonough instructed plaintiff to "[p]ut that phone down" (Ex. 1 at 141:15-141:24), and once by Sgt. Sean Martin when he was explaining the basis of the search warrant (Ex. 1 at 149:12-149:20), all the conversation between plaintiff and the defendant officers during the execution of the warrant was friendly and professional. Ex. 1 at 159:5-159:13; Ex. 2 at 174:20-174:24.

68. Plaintiff was not physically mistreated by the defendant officers at any time. Ex. 1 at 149:7-149:9.

69. The defendant officers searched plaintiff's house until they were satisfied to a reasonable degree of certainty that "T," narcotics or evidence of the sale of narcotics as described in the search warrant were not present, or could not be found in a reasonable search due to the condition of the house, at which time the defendant officers left plaintiff's residence. Ex. 2 at 252:9-252:16; 189:24-190:3; 192:2-192:6; 193:7-194:3; Ex. 5 at ¶ 18.

70. The search of 4718 S. Shields was prolonged due to the condition of the house: the disarray, disorganization and the amount of debris and clutter throughout the house. Ex. 5 at ¶ 16.

71. A substantial amount of the time spent searching the house was devoted to attempting to locate proof of residence to determine whether there were other residents of 4718 S. Shields, particularly individuals who matched the description of "T," which took significantly longer than normal due to the condition of the house, including mail, papers, and documents located in boxes and large containers and

12

        strewn throughout house. Ex. 5 at ¶ 17; Ex. 4B-4K.

72. Although the defendant officers were satisfied with the scope of their search, because of the disarray and the condition of plaintiff's residence, there were still places in the home that had not been searched. Ex. 2 at 192:2-194:19; Ex. 5 at ¶ 18.

73. The defendant officers were in plaintiff's home for a total of approximately one and one-half to two hours. Ex. 2 at 183:4-183:9; 185:18-185:23; 252:9-252:16; Ex. 9 at 8:19-9:2; 14:10-14:14.

                          Respectfully submitted,

                          BORKAN & SCAHILL, LTD.

                          By:     s/Graham P. Miller
                                   Graham P. Miller

Timothy P. Scahill (6287296)
Graham P. Miller (6290240)
Andrew K. Scott (6306956)
BORKAN & SCAHILL, LTD.
Two First National Plaza
20 South Clark Street
Suite 1700
Chicago, Illinois 60603
(312) 580-1030