# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| KATRINA WALKER, | ) | |
| | ) | |
| Plaintiff, | ) | No. 12-cv-08571 |
| | ) | |
| v. | ) | Judge Andrea R. Wood |
| | ) | |
| CARL WEATHERSPOON, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiff Katrina Walker has sued Chicago Police Officers Carl Weatherspoon, Sean Martin, Jerry Crisp, Chris Chmelar, James Davis, Edward Johnson, Patrick McDonough, and Gerald O'Malley ("Defendant Officers"), as well as the City of Chicago (together with the Defendant Officers, "Defendants"), alleging that she was unlawfully searched, seized, assaulted, and battered in her home while the Defendant Officers were executing a search warrant. Defendants have filed a motion for summary judgment. (Dkt. No. 41.) For the reasons explained below, the motion is granted.

## BACKGROUND

The central focus of this lawsuit is a search that the Defendant Officers executed at Walker's house. The search warrant was based on information provided by an unidentified "J. Doe" informant regarding purported heroin sales at Walker's house by a man known only as "T." Walker claims it should have been readily apparent to the Defendant Officers upon entering her home that the information provided by J. Doe was mistaken and that no one named "T" resided there. Accordingly, Walker has filed this lawsuit asserting claims for unlawful search and seizure, excessive force, conspiracy, assault, battery, and intentional infliction of emotional distress.

Unless otherwise noted, the following facts are not disputed by the parties for purposes of the instant summary judgment motion.

Sometime in October 2011, Officer Weatherspoon was contacted by two 2nd District police officers—Officer Kerry Murray and Officer Joe Harris. Murray and Harris provided Weatherspoon with information regarding a J. Doe informant, including J. Doe's phone number and handwritten notes relating to the officers' conversation with her. (Pl. Resp. to Def. Stmnt. of Mat. Fact ¶ 3, Dkt. No. 50.) Weatherspoon called J. Doe and spoke to her over the phone. J. Doe told Weatherspoon that "she normally buys heroin from a man known as 'T' and that she could show Officer Weatherspoon where such drugs were sold." (*Id.* ¶ 5.) During this initial conversation, Weatherspoon asked J. Doe to meet him at the police station; a short time later, J. Doe came to the police station with her father and met with Weatherspoon for a couple of hours. (*Id.* ¶¶ 7–8.) During that meeting, J. Doe confirmed the information that Harris and Murray previously had provided to Weatherspoon and "spoke about how she bought drugs from 'T,' gave a description of 'T,' and told Officer Weatherspoon how she would set up a meeting to purchase drugs and where her drug transactions took place." (*Id.* ¶ 9.) To describe where she met with "T," J. Doe indicated that she "exits 47th Street, goes west from the Dan Ryan a couple of blocks, makes a left, and goes to a house next to a vacant lot." (*Id.* ¶ 10.) J. Doe could not provide an address for the target residence. (Pl. Stmnt. of Add'l Mat. Facts ¶ 9, Dkt. No. 49.) J. Doe also could not provide a full name for "T," and Weatherspoon was unable to discover "T"'s true identity. (*Id.* ¶ 10.) J. Doe stated that "T" drove a gold four-door Chrysler Concorde with tinted rear windows and that he "parked it in the lot next to his house." (*Id.* ¶ 15.) Weatherspoon or one of his team members performed a background check on J. Doe, revealing a prior misdemeanor

arrest for theft and no convictions. (Def. Stmnt. of Mat. Facts ¶ 11, Dkt. No. 43; Pl. Stmnt. of Add'l Mat. Facts ¶ 5, Dkt. No. 49.)

After meeting with J. Doe, Weatherspoon drove J. Doe and her father to where J. Doe indicated she bought heroin. To get to the house, "J. Doe gave Officer Weatherspoon descriptive directions to the location and, upon arrival, pointed to 4718 S. Shields as the house where she purchased heroin." (Pl. Resp. to Def. Stmnt. of Mat. Fact ¶ 12, Dkt. No. 50.) J. Doe indicated that she would call "T" when she was exiting the expressway at 47th Street to let him know she was on her way. (*Id.* ¶ 13.) J. Doe further stated that sometimes "T" would meet her outside the house and other times she was allowed into the house. (*Id.* ¶ 14.) The locations where they met outside of the house were "in the vicinity of 4718 S. Shields." (*Id.* ¶ 15.) J. Doe further told Weatherspoon that when she was allowed inside the house, "she would remain in the living room while 'T' would go into a side room and return a short time later with the drugs." (*Id.* ¶ 16.) J. Doe indicated she had been purchasing drugs from "T" for approximately six months. (*Id.* ¶ 17.)

After seeing the house at 4718 S. Shields with J. Doe and her father, Weatherspoon returned to the area twice. On his second visit, he observed two narcotics transactions on the same block as 4718 S. Shields within 20 minutes. (*Id.* ¶¶ 20–21.) Weatherspoon then met with J. Doe in person again. (*Id.* ¶ 23.)

On October 24, 2011, J. Doe called Weatherspoon and told him that she "had just purchased heroin from 'T' at the house at 4718 S. Shields." (*Id.* ¶ 28.) Weatherspoon asked J. Doe if she would be willing to appear before a judge and attest to the facts surrounding the transactions at 4718 S. Shields, and she agreed to do so. (*Id.* ¶ 29.) Prior to appearing before the judge, Weatherspoon obtained approval for the Complaint for Search Warrant from Assistant State's Attorney Dustin Smith. (*Id.* ¶ 31.) Weatherspoon did not attempt to call a cell phone number for

"T" provided by Murray and Harris, he did not attempt to conduct a controlled buy at 4817 S. Shields, and he did not obtain any independent information from sources other than J. Doe regarding who lived at 4718 S. Shields. (Pl. Stmnt. of Add'l Mat. Facts ¶¶ 22–24, Dkt. No. 49.)

On the way to the hearing with the judge, J. Doe informed Weatherspoon "that she was trying to do better, trying not to disappoint her parents, and trying to kick her habit." (Pl. Resp. to Def. Stmnt. of Mat. Fact ¶ 32, Dkt. No. 50.) J. Doe testified under oath on October 25, 2011, with the judge questioning her regarding her purchase of heroin at 4718 S. Shields. (*Id.* ¶¶ 33–34.) The judge asked J. Doe about, among other topics, "her past use and purchases of narcotics." (*Id.* ¶ 35.) After hearing J. Doe testify, the judge determined that there was probable cause to search the house at 4718 S. Shields for narcotics and evidence related to the sale of narcotics, and signed a search warrant. (*Id.* ¶ 37.) The search warrant authorized officers to search 4718 S. Shields for "[h]eroin, to wit a controlled substance, any documents proving residency, any paraphernalia used in the cutting or weighing of illegal drugs, any money suspected to be illegal drug sales proceeds, and any records detailing illegal drug transactions" as well as for the individual described as "T." (*Id.* ¶ 38.)

The Defendant Officers arrived at 4718 S. Shields to execute the warrant around 4:15 pm on October 26, 2011. (*Id.* ¶ 39.) When the Defendant Officers reached Walker's steel-front security door, they banged on it loudly and announced themselves as the police. (*Id.* ¶ 41.) At that time, Walker was in her back bedroom with the door closed and the television on. (*Id.* ¶ 42.) When no one answered Walker's door, the Defendant Officers breached the door and entered the house, announcing that they were Chicago police and had a search warrant. (*Id.* ¶¶ 43–44.) The house had a front bedroom off to the side between the front living room and kitchen. (*Id.* ¶ 46.) Upon entering the house, the Defendant Officers found it to be "in disarray with clutter all over

4

the place." (*Id.* ¶ 47.) In Weatherspoon's experience, the appearance of the house was consistent with narcotics activity. (*Id.* ¶ 49.) The Defendant Officers split up and cleared the house for potential threats. Officer McDonough was the first officer through the door and the first to reach Walker in her bedroom. (*Id.* ¶¶ 50–51.) McDonough put his foot in Walker's bedroom door to stop her from closing it and instructed her to come out, and Walker came out after one of the Defendant Officers gave her a jacket to wear. (*Id.* ¶¶ 52–53.) McDonough was carrying a rifle, which he had out as he entered the house and moved down the hallway. (*Id.* ¶¶ 54–55.) At no time did any weapon make physical contact with Walker. (*Id.* ¶ 59.) Once she came out of her bedroom, Walker was immediately led to the front living room and the Defendant Officers began to search the house pursuant to the search warrant—searching for narcotics, drug paraphernalia, plastic bags, packaging for narcotics, ledgers, scales, and other items that might pertain to drug transactions. (*Id.* ¶¶ 60–61.)

At some point during the search, Walker told the Defendant Officers she had a firearm in the house but she was unable to recall where it was, other than that it was in her bedroom. The Defendant Officers ultimately found the firearm in a cardboard box under several magazines. (*Id.* ¶¶ 62–64.) Walker remained in the front room (with a uniformed female officer who had been called in) for the duration of the search until the Defendant Officers left the premises. (*Id.* ¶ 65.) The search was prolonged due to the disarray and disorganization of the house and the amount of debris and clutter present—as the Defendant Officers attempted to locate proof of residence to determine if other individuals were residents of the house, such as someone matching the description given for "T." (*Id.* ¶¶ 70–71.) The Defendant Officers left the residence once they were satisfied to a "reasonable degree of certainty that 'T,' narcotics or evidence of the sale of narcotics as described in the search warrant were not present, or could not be found in a

5

reasonable search due to the condition of the house." (*Id*. ¶ 69.) The Defendant Officers were in Walker's home for a total of approximately one and one-half to two hours. (*Id*. ¶ 73.) Weatherspoon never found "T" or the gold Chrysler Concorde associated with "T." (Pl. Stmnt. of Add'l Mat. Facts ¶¶ 16–17, Dkt. No. 49.)

## DISCUSSION

"Summary judgment is appropriate where the evidence shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Johnson v. Manitowoc Cty. et al.*, 635 F.3d 331, 334 (7th Cir. 2011) (internal quotation marks omitted). In considering a summary judgment motion, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Walbridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)). "In evaluating whether a genuine issue of material fact exists, all evidence and inferences must be viewed in the light most favorable to the nonmoving party." *Scott v. Edinburg*, 346 F.3d 752, 755 (7th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) and *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003)). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Balderston*, 328 F.3d at 320 (quoting *Anderson*, 477 U.S. at 247–48 (emphasis in original)).

### I. Search and Seizure

"When assessing whether a constitutional violation has occurred, the Fourth Amendment inquiry is one of objective reasonableness under the circumstances." *Molina ex rel. Molina v. Cooper*, 325 F.3d 963, 973 (7th Cir. 2003) (internal citations and quotations omitted). A "search pursuant to a valid warrant is presumptively constitutional unless the officer seeking the warrant

intentionally or recklessly misstated or omitted material facts to obtain the warrant, and there would not have been probable cause had the testimony been accurate." *Gatzimos v. Garrett*, 431 Fed. Appx. 497, 501 (7th Cir. 2011) (citing, *inter alia*, *Franks v. Delaware*, 438 U.S. 154, 171–72 (1978)). "In determining whether information submitted to a judicial officer in support of a warrant application was sufficient to establish probable cause, [the court] look[s] only at what the officer knew at the time he sought the warrant, not at how things turned out in hindsight." *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003).

In deciding whether an informant's tip provided a sufficient basis from which to find probable cause, the Court considers the following:

> (1) the degree to which the informant has acquired knowledge of the events through firsthand observation, (2) the amount of detail provided, (3) the extent to which the police have corroborated the informant's statements, and (4) the interval between the date of the events and the police officer's application for the search warrant. It is also significant if an informant appears before the magistrate in person and files his or her own supportive affidavit; doing so affords the magistrate a greater opportunity to assess credibility.

*United States v. Sutton*, 742 F.3d 770, 773 (7th Cir. 2014); *see United States v. Koerth*, 312 F.3d 862, 866 (7th Cir. 2002) ("The court should also consider whether the informant personally appeared and presented an affidavit or testified before the magistrate, thus allowing the judge to evaluate the informant's knowledge, demeanor, and sincerity."). "No one factor is dispositive, so a deficiency in some areas can be compensated by a stronger showing in others." *United States v. Bell*, 585 F.3d 1045, 1049 (7th Cir. 2009). As for the execution of the search warrant, it is "generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant." *Johnson*, 635 F.3d at 335 (quoting *Dalia v. United States*, 441 U.S. 238, 257 (1979)). "Whether the manner of execution is reasonable is a fact-specific inquiry based on the totality of the circumstances facing the officers executing the warrant." *United States v. Norris*, 640 F.3d 295, 302 (7th Cir. 2011).

The record in this case establishes as a matter of law that there was probable cause to support the issuance of the search warrant and that the subsequent execution of the search at Walker's residence was reasonable.

Weatherspoon took a number of steps to corroborate J. Doe's statements that formed the basis for the search warrant. Walker does not dispute that Weatherspoon was placed in touch with J. Doe by two other Chicago police officers and that J. Doe and her father then met with Weatherspoon at the police station, where J. Doe confirmed the information the two officers had told Weatherspoon about "T"—namely, how J. Doe bought drugs from "T," how she would set up meetings to purchase drugs from "T," where the drug transactions took place, and a description of "T." J. Doe also provided specific directions for how she drove to the house, even though she was unable to provide the address. Following J. Doe's directions, Weatherspoon then drove J. Doe and her father to the house where she said she purchased heroin, at which point J. Doe identified the house located at 4718 S. Shields as the house where she had purchased heroin. Weatherspoon drove back to 4718 S. Shields twice after his initial visit with J. Doe and her father. On the second visit, he observed two narcotics transactions on the same block within a 20-minute time span. Weatherspoon or someone on his team then pulled a photograph of 4718 S. Shields from the Cook County Assessor's Office and also ran a background check of J. Doe, finding one misdemeanor arrest and no convictions. After J. Doe called Weatherspoon to inform him that she just purchased heroin again from "T" at 4718 S. Shields, Weatherspoon asked her to appear before a judge and attest to the facts surrounding her transactions at 4718 S. Shields. While Weatherspoon may not have tried to contact "T" at his cell phone number, attempted a controlled buy, or been able to find the gold Chrysler that "T" supposedly drove, that does not mean that the actions Weatherspoon did undertake to corroborate J. Doe's story were insufficient. *See United States v.*

*Jones*, 208 F.3d 603, 607 (7th Cir. 2000) ("The fact that [the defendant] can point out additional things which could have been done but were not does not in any way detract from what was done.").

J. Doe also provided a good amount of detail regarding "T" and the transactions that allegedly took place at or around 4718 S. Shields. She provided directions for how she would drive to the house to purchase heroin and pointed out the house to Weatherspoon in person. J. Doe explained that she would call "T" when she was getting off of the expressway at 47th Street to let him know she was en route, that all of her meetings with "T" occurred at or around 4718 S. Shields, and that, when she was permitted to go into the house, she would remain in the living room while "T" went into a side room and returned a short time later with drugs. J. Doe stated she had been purchasing heroin from "T" in that manner for approximately six months.

Walker places a great deal of emphasis on the facts that J. Doe did not know "T"'s true name or the street address of the house, that J. Doe did not describe the interior of the house, and that Weatherspoon did not know precisely how much heroin J. Doe had purchased from "T." Those arguments are unpersuasive. While J. Doe could not provide an address, she did provide descriptive driving directions and, in fact, identified the house in person after being driven there by Weatherspoon according to her own directions. J. Doe re-affirmed that it was the correct residence both by calling Weatherspoon again to inform him she just purchased heroin from "T" at the house and by testifying in front of a judge. The Court does not find it meaningful that J. Doe did not know "T"'s true name—people engaging in illegal activity often decline to provide their real names to their customers. As for the precise amount of heroin purchased and the amount spent, while Weatherspoon may not have had this level of detail, he had a general understanding of how the transactions took place and that J. Doe had been making purchases from "T" for six

months. With regard to the clutter and disarray of the house, Walker does not dispute that in Officer Weatherspoon's experience, the appearance of the house was consistent with narcotics activity. It is therefore reasonable to assume that J. Doe, who had purchased drugs on repeated occasions, might not have thought it noteworthy that the house was cluttered and disorganized.

There are two other factors Walker does not mention that are relevant in determining whether an affidavit supported by an informant's tip is sufficient to establish probable cause: (1) whether the informant has first-hand knowledge of the events at issue, and (2) the length of time between the events in question and the application for the search warrant. *Sutton*, 742 F.3d at 773. Here, J. Doe had first-hand knowledge of all of the events; she was not reporting that someone else made purchases from "T" at the house, that she observed another person making purchases, or that she heard about "T" from a third-party. She instead was providing detail regarding her own purchases of heroin from "T" at 4718 S. Shields. As for the second factor, the most recent buy that J. Doe made from "T" took place 24 hours prior to obtaining the search warrant.

Walker argues that J. Doe's testimony should have been discounted because she did not have a prior relationship with Weatherspoon and she had a previous arrest for theft. J. Doe did have a relationship with two other Chicago police officers, however, and she did speak with Weatherspoon on more than one occasion regarding her heroin purchases. Even accounting for the facts that she had a prior arrest and that she had not worked with Weatherspoon previously, the factors identified by the Seventh Circuit for use in determining whether probable cause exists when an affidavit is supported by an informant's tip are clearly met here. Any concern that the factors could have been met more fully is assuaged by the fact that J. Doe appeared before a judge and testified about her heroin purchases at 4718 S. Shields.

Walker lastly argues that it should have been obvious that the Defendant Officers were in the wrong house. This, however, is not a case of a mistaken search—J. Doe very clearly identified the house at 4718 S. Shields as the house where she purchased heroin from "T" and there has been no allegation that the Defendant Officers went to the wrong address. When the Defendant Officers entered Walker's home, the layout of the house, with a living room in the front and a room off to the side where a door could be closed, met the description provided by J. Doe. Nonetheless, Walker argues that because "T" was not present but she was, and she is a Cook County Deputy Sheriff, the Defendant Officers should have realized that it was not possible for the information provided by J. Doe to be true.

But the absence of "T" at the time of the search does not mean that the Defendant Officers would automatically have known that "T" did not live at the house or use the house to sell drugs. It was equally reasonable to conclude that "T" was out of the house for some reason, leaving Walker home alone. *See Los Angeles Cty, Cal. v. Rettele*, 550 U.S. 609, 613 (2007). And Walker's status as a law enforcement officer does not entitle her to preferential treatment in the execution of a valid search warrant. The Defendant Officers searched the house for one and one-half to two hours and then left the premises. It is undisputed that they spent longer than normal searching the house due to the disarray and clutter, which made it difficult for them to find proof of residency and other items relevant to the warrant. Given the totality of the circumstances, the execution of the search and seizure was objectively reasonable and consistent with the mandates of the search warrant. While the ultimate outcome may have been that an innocent person was subjected to a search, that is not a sufficient basis to support a claim under Section 1983:

> The Fourth Amendment allows warrants to issue on probable cause, a standard well short of absolute certainty. Valid warrants will issue to search the innocent . . . . Officers executing search warrants on occasion enter a house when residents are engaged in private activity; and the resulting frustration, embarrassment, and humiliation may be real, as was

> true here. When officers execute a valid warrant and act in a reasonable manner to protect themselves from harm, however, the Fourth Amendment is not violated.

*Rettele*, 550 U.S. at 615–16. Defendants' motion for summary judgment on the search and seizure claims is therefore granted.

## II. Excessive Force

Walker also asserts a claim against the Defendant Officers for use of excessive force.[1] "The force employed by an officer is deemed excessive if, in light of the totality of the circumstances, it was greater than was reasonably necessary to effectuate the seizure." *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 685 (7th Cir. 2007). A court considering an excessive force claim examines the facts as they would have appeared to a reasonable officer at the scene, "keeping in mind that an officer often must make a split-second judgment based on rapidly evolving circumstances." *Id.* Additionally, "[p]laintiffs need not show physical injury in order to sustain an excessive force claim[; instead,] an arrest can be effectuated by the slightest application of physical force, or by some other show of authority. The issue is simply whether, once it is clear . . . that a seizure has occurred, that seizure meets Fourth Amendment standards." *Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009) (internal citation omitted).

The Supreme Court has held that "officers executing a search warrant for contraband have the authority 'to detain the occupants of the premises while a proper search is conducted.'" *Muehler v. Mena*, 544 U.S. 93, 98 (2005) (quoting *Michigan v. Summers*, 452 U.S. 692, 705 (1981). Indeed, "[i]nherent in *Summers'* authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention." *Id.* There are

---

[1] In their summary judgment motion, Defendants argue that the excessive force claim should fail as a matter of law. Notably, Walker does not raise any arguments in support of her excessive force claim in her response brief. Nonetheless, contrary to the position taken by Defendants, summary judgment cannot automatically be granted simply due to the lack of a response; the Court is still obligated to determine whether any genuine issues of material fact exist. *See Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992); *Big O Tire Dealers, Inc. v. Big O Warehouse*, 741 F.2d 160, 163 (7th Cir. 1984).

circumstances under which pointing a gun during the course of a search constitutes the use of excessive force. If, for instance, there is no "reasonable threat of danger or violence to police," and the individual at whom the gun was pointed was "compliant and present[ed] no danger," pointing a gun at them could be considered a use of excessive force even absent any physical injury. *Baird*, 576 F.3d at 346. The relevant inquiry for present purposes is whether there is a genuine issue of material fact as to whether there was a reasonable threat of danger or violence to the police at the time that Officer McDonough's gun may have been pointed at Walker.

It is undisputed that Officer McDonough was the first officer to enter the house and the first to reach Walker in her bedroom. As he entered the house and moved down the hallway, he had his rifle out. When McDonough reached Walker in her bedroom, he put his foot in the bedroom door to stop her from closing it and instructed her to come out. (Pl. Resp. to Def. Stmnt. of Mat. Fact ¶¶ 51–55, Dkt. No. 50.) The parties dispute whether McDonough had his rifle pointed at Walker. (*Id.* ¶ 56.)[2] Walker contends that she was physically mistreated when McDonough "screamed at her while pointing an 'M-16' rifle at her, with his finger on the trigger." (*Id.* ¶ 69.)[3] But the parties agree that after Walker emerged from her bedroom, none of

---

[2] Walker is not clear in her deposition whether McDonough had his rifle "pointed" at her:

> Q: But from your perspective, I mean was the police officer actually pointing the barrel of the gun at you or was it just out?
> A: It was just out, but it seemed like it was – it was different. I didn't have the gun all the time, but it's different when somebody got the gun at you. You might think – Then I looked at his finger, and his finger was on the trigger.
> Q: Right. But I'm just making sure he wasn't actually pointing it at you. He just had the gun out and you were right next to it, correct?
> A: Right. I was right next to it.

Def. Mem. of Law in Support of Summ. J., Exh. 1, at 145:3–145:14, Dkt. No. 42-1.

[3] In Walker's deposition, she testified that McDonough screamed at her: "Put that phone down. Put it down." Def. Mem. of Law in Support of Summ. J., Exh. 1, at 141:23–141:24, Dkt. No. 42-1.

13

the Defendant Officers pointed a gun at her, and at no other time did any Defendant Officer point a weapon at her. (*Id.* ¶¶ 57–59.)[4]

Based on the undisputed facts, the Court finds that Walker's excessive force claim cannot survive summary judgment. Because no one answered the door when the Defendant Officers announced themselves, they had to breach the door to enter Walker's house. (*Id.* ¶ 43.) The Defendant Officers then announced that they were Chicago Police and they had a search warrant. (*Id.* ¶ 44.) This particular search was for heroin, drug paraphernalia, illegal drug sales proceeds, and for an individual described as "T." (*Id.* ¶ 38.) Upon entering the house, Officer McDonough was faced with an individual attempting to close the door to a back bedroom to keep him from entering. Given these facts, it was not unreasonable for him to have pointed his gun at her prior to establishing that she was unarmed, that she was not dangerous, and that she intended to cooperate with the search. McDonough could not have known whether she was alone in the room or whether others were present, or whether she was intending to procure a weapon after closing her bedroom door.[5] McDonough could not have known whether at the time he arrived Walker was talking to someone unrelated to the search on the phone, or whether she was planning to give instructions to a third party that would have interfered with the search. Once it was established that Walker was going to come out of the room and cooperate with the search, none of the Defendant Officers pointed any weapons at her, and at no time did any weapons make physical contact with Walker.

---

[4] Walker testified at her deposition that a sergeant "screamed" at her approximately 30 minutes prior to the conclusion of the search that they had a confidential informant that placed drugs at her residence. But Walker does not raise this as an argument in response to the motion for summary judgment, and the Court does not find that this claim changes any of the analysis provided here. Def. Mem. of Law in Support of Summ. J., Exh. 1, at 149:17–149:20, Dkt. No. 42-1.

[5] During Walker's deposition, she testified in reference to McDonough pointing the rifle at her behind the bedroom door: "We had like – you know, he came to the door like that. I don't know who he thought was behind it, but that's the way – I guess to protect himself." Def. Mem. of Law in Support of Summ. J., Exh. 1, at 144:15–144:17, Dkt. No. 42-1. She also testified: "He couldn't see all the way in, no." *Id.* at 144:19.

Considering all of the circumstances present—and the brief amount of time during which the gun may have been pointed at Walker—the evidence before the Court is not sufficient to create a genuine issue of material fact as to whether excessive force was used. Summary judgment is therefore granted on that count as well.

### III.  Conspiracy

Because summary judgment has been granted in Defendants' favor on all of the Section 1983 claims, Walker cannot proceed with her claim that the Defendant Officers "reached an agreement amongst themselves to deprive Walker of her constitutional rights." (1st Am. Compl. ¶ 27, Dkt. No. 26.) "[T]here is no constitutional violation in conspiring to cover-up an action which does not itself violate the Constitution." *Hill v. Shobe*, 93 F.3d 418, 422 (7th Cir. 1996); *see Smith v. Gomez*, 550 F.3d 613 (7th Cir. 2008) ("[C]onspiracy is not an independent basis of liability in § 1983 actions.").[6]

### IV.  State Law Tort Claims

Finally, Walker asserts state law tort claims for battery, assault, and intentional infliction of emotional distress. In response to Defendants' motion for summary judgment, Walker does not dispute that at no time did any weapon make physical contact with her. (Pl. Resp. to Def. Stmnt. of Mat. Fact ¶ 59, Dkt. No. 50.) As such, her battery claims fail as a matter of law. The Court next turns to Walker's claims for assault and intentional infliction of emotional distress.

Walker claims that Officer McDonough pointed his "M16-style" rifle at her with his finger on the trigger and while screaming at her, placing her in reasonable apprehension of receiving a battery. (*Id.* ¶ 68.) This Court agrees with Defendants that Walker's claim is barred by the Illinois

---

[6] As Walker cannot show that her constitutional rights were violated, there is also no need to consider the Officer Defendants' qualified immunity arguments. *See Mucha v. Vill. of Oak Brook*, 650 F.3d 1053, 1057 (7th Cir. 2011).

Tort Immunity Act, which provides that "[a] public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202. Willful and wanton conduct is defined as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210.

Walker has not presented sufficient evidence from which a reasonable jury could conclude that the Defendant Officers committed willful and wanton conduct. The Defendant Officers were executing a valid search warrant on the premises. Walker did not answer the door when they arrived and then attempted to close her bedroom door when the Defendant Officers breached the front door and moved down the hallway toward her bedroom. None of the facts presented here are sufficient to support a claim that the conduct of the Defendant Officers while executing the search warrant was outside of the bounds of reasonableness. As explained above, the amount of time during which the disputed altercation took place was brief, and after Walker came out of her bedroom, none of the Defendant Officers pointed any weapons at her. During the remainder of the search, Walker remained in the front living room with a uniformed female police officer. The search lasted somewhere between ninety minutes and two hours, at which point the Defendant Officers left the premises. None of the conduct described by Walker indicates that Defendant Officers acted outside of the boundaries of reasonableness in how they proceeded. Accordingly, Defendants' motion for summary judgment on the state law tort claims is granted.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is granted. The Clerk of Court is directed to enter Judgment in favor of Defendants.

ENTERED:

Dated: August 15, 2017

_____
Andrea R. Wood
United States District Judge